IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| TONIA CIARAMITARO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 13-4016-CV-C-ODS-SSA |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER AND OPINION AFFIRMING
## COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Plaintiff brings this suit challenging the Commissioner's final administrative decision denying her application for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff was born November 11, 1966, and completed the tenth grade. Plaintiff 's prior work experience includes work as a painter. She alleges she became disabled on June 1, 2006, due to right and left shoulder problems, sleeping problems, hand problems, depression, and headaches.

Plaintiff saw David Mook, M.D., on April 24, 2007, to establish care. R. 210. On May 7, 2007, Dr. Mook diagnosed Plaintiff with impingement syndrome of the right shoulder, tobacco abuse, and previous alcohol and drug abuse. R. 209. Dr. Mook recommended ice and shoulder exercises. R. 209. On May 21, 2007, Plaintiff underwent a bone density scan, which showed osteopenia of the left femur and lumbar spine. R. 379.

Plaintiff began seeing Zaheda Nasreen, M.D., on December 3, 2007. R. 229. Plaintiff saw Dr. Nasreen four times from December 3, 2007, to March 10, 2008. R. 223, 225, 227, 229. Dr. Nasreen diagnosed Plaintiff with depression, anxiety, right shoulder pain, and neck pain. R. 223, 229.

Meanwhile, on December 4, 2007, imaging of Plaintiff's right shoulder showed "no definite pathology." R. 214. On February 20, 2008, Plaintiff went to the emergency room complaining of chest pain and weakness. R. 360. Plaintiff was diagnosed with seizure activity and anxiety. R. 359. On March 10, 2009, imaging of Plaintiff's left foot showed "no acute radiographic abnormalities," and imaging of her cervical spine was unremarkable. R. 215-16.

On May 12, 2008, Corine Rao, M.D., examined Plaintiff and diagnosed her with pharyngitis, acute bronchitis, right shoulder pain, tobacco use disorder, and seizure disorder. R. 254. A magnetic resonance imaging ("MRI") of Plaintiff's right shoulder showed severe tendinosis. R. 259.

On June 23, 2008, Plaintiff saw Jeffrey Jones, D.O., and complained of "some pain with overhead activities." R. 288. Dr. Jones stated that "[e]xamination of the cervical spine reveal[ed] good mobility without reproduction of her pain." R. 288. He diagnosed Plaintiff with right shoulder impingement syndrome and administered an injection into her right shoulder. R. 289. Plaintiff reported she had a "great day" on the third day after the injection, but the pain returned when she washed her car. R. 278.

On January 6, 2009, Christine Cooper, M.A., L.P.C., examined Plaintiff and observed that Plaintiff had an anxious and agitated behavior, depressed mood, and sad, fearful, and flat affect. R. 445. Plaintiff had recent intact memory and perception within normal limits. R. 445-46. Ms. Cooper diagnosed Plaintiff with depression and anxiety. R. 447.

On February 10, 2009, Plaintiff presented to Medical Missions for Christ Community Health center with depression, headaches, and shoulder pain. R. 388, 450. She was diagnosed with depression, tension headache, degenerative joint disease, and anxiety. R. 450.

On June 29, 2009, Jeffrey Woodward, M.D., performed a consultative examination. R. 395. Plaintiff reported bilateral hand and shoulder pain with difficulty

2

completing her activities of daily living and lifting objects. R. 395. On exam, Plaintiff exhibited moderate impingement pain, diffuse joint pain, and moderate crepitus of the right upper extremity. R. 398. Dr. Woodward assessed that Plaintiff could perform light work at chest level or below but could not work above chest level. R. 400. He also assessed that she could not climb, crawl, or balance. R. 400. He further assessed that Plaintiff would not be able to operate machinery with the upper extremities. R. 400. He observed that Plaintiff had diffuse pain in her shoulders and moderate impingement pain but a normal gait, an ability to heel and toe walk, and no objective neurological deficits. R. 398. He also observed that Plaintiff did not have any depression, anxiety, or agitation. R. 398. Dr. Woodward opined that Plaintiff could frequently lift up to 10 pounds and occasionally lift up to 20 pounds from floor to chest level, sit without restrictions, and stand or walk 6 hours in a day. R. 400.

On January 14, 2010, a nurse practitioner diagnosed Plaintiff with menopause, anxiety, a history of seizures, and shoulder pain. R. 442. Dr. Barry diagnosed Plaintiff with depression, seizures by history, and right shoulder pain on January 19, 2010. That same day, Ms. Cooper noted that Plaintiff had a sad, deflated, and anxious mood and affect but thought patterns within normal limits. R. 439. She diagnosed Plaintiff with marked depression, anxiety, and panic attacks with agoraphobia. R. 439.

On February 5, 2010, Plaintiff arrived in the emergency room stating that she had ingested an unknown number of pills after an altercation with her boyfriend. R. 484. Plaintiff was admitted to the hospital. R. 599. Medical staff noted that her "mood slowly improved and her suicidal thoughts were resolved." R. 600. Plaintiff was discharged on February 11, 2010, with diagnoses of mood disorder secondary to a general medical condition and alcohol dependence. R. 599.

On February 25, 2010, Plaintiff saw Matthew Smith, M.D., for complaints of shoulder pain. R. 586. X-rays of Plaintiff's shoulders and cervical spine were unremarkable. R. 589, 593.

On March 2, 2010, Dr. McDonald diagnosed Plaintiff with a seizure, chronic shoulder pain, and anxiety/depression. R. 438. That same day, Plaintiff saw Ms. Cooper. R. 437. Plaintiff reported that she had been admitted to the hospital because she "inadvertently took too many of her pills" when she forgot she had already taken

3

them. R. 437. Ms. Cooper noted that this explanation was not the same one she gave to hospital staff. R. 437.

On May 21, 2010, Jennifer Stevens, Psy.D., evaluated Plaintiff for the Camden County Family Support Division. R. 419. Plaintiff complained of psychological symptoms including not wanting to leave her house and being fearful to be in public places. R. 419. Dr. Stevens observed Plaintiff had deficits in immediate memory. R. 420. She also observed that Plaintiff had intact quality of thinking, abstract conceptual reasoning, and social judgment skills. R. 420. She diagnosed Plaintiff with dysthymic disorder, social phobia, and generalized anxiety disorder. R. 421. Dr. Stevens concluded that Plaintiff was "[m]edically eligible in terms of [w]orking [d]isabled" for medical assistance. R. 421.

Plaintiff complained of leg pain on June 1, 2010. R. 433. Dr. McDonald diagnosed Plaintiff with right knee pain and chronic right shoulder pain. R. 433. On June 7, 2010, Ms. Cooper reported that Plaintiff's speech was loud, angry, and demanding. R. 431. Her mood and affect was agitated, sad, angry, and helpless. R. 431. On June 15, 2010, Plaintiff complained of panic attacks. R. 432.

On July 6, 2010, Dr. McDonald diagnosed Plaintiff with panic attacks, developing phobia, and seizures. R. 430. An MRI of Plaintiff's right knee on July 21, 2010, showed a cyst and minimal edema. R. 471.

On October 5, 2010, Plaintiff presented to Pathways Outpatient for assessment. R. 557. Plaintiff reported experiencing panic attacks, paranoia, difficulty concentrating, occasional suicidal thoughts, and auditory hallucinations. R. 557. Plaintiff was diagnosed with major depressive disorder and post-traumatic stress disorder ("PTSD"). R. 560.

Richard White, M.D., examined Plaintiff's shoulders on October 13, 2010. R. 575. An x-ray of Plaintiff's shoulder showed no facture, dislocation, or significant degenerative changes. R. 578. Dr. White said it did not "sound like this would be a surgical issue at this point" and that he believed the problem was "more likely to be coming from her neck." R. 576-77.

On November 3, 2010, Mahal Satnam, M.D., noted Plaintiff was "fidgety and restless" and had "difficulty concentrating and focusing on task." R. 565. However, he

4

indicated that Plaintiff had normal flow of thought. R. 565. Dr. Satnam diagnosed Plaintiff with recurrent major depressive disorder, PTSD, and a history of alcohol and methamphetamine abuse. R. 565

Imaging of Plaintiff's abdomen and pelvis taken on November 4, 2010, revealed a lesion and cyst in the liver and "mild compression deformity." R. 469. On November 15, 2010, imaging of the abdomen showed a lesion in the liver "most likely representing a benign hemangioma." R. 467. Plaintiff also underwent a bone density study that same day that showed osteopenia in Plaintiff's lumbar spine and left femoral neck. R. 465-66.

On November 16, 2010, Tom Reinsel, M.D., examined Plaintiff. R. 570. Dr. Reinsel opined that Plaintiff's "neck disability index score today [was] 85% indicating complete disability. R. 470. He opined that Plaintiff had "normal range of motion in her neck," a normal gait, and an ability to "walk on her heels and toes without difficulty." R. 571. He noted that an MRI of Plaintiff's cervical spine showed "some minor multilevel disc changes, but nothing really substantial." R. 571-72.

On November 23, 2010, Plaintiff presented again to Pathways Outpatient. R. 528. Plaintiff presented with extreme anxiety and reported that she experienced frequent panic attacks. R. 528. She also stated that she did not like to be home alone due to paranoia. R. 528.

On December 9, 2010, Dr. McDonald completed a medical source statement—physical to assess Plaintiff's physical limitations. R. 517. He opined that Plaintiff could occasionally and frequently lift 5 pounds, stand or walk less than 1 hour in an 8-hour day, and sit 1 hour in an 8-hour day. R. 517. Dr. McDonald indicated that Plaintiff could frequently see, speak, and hear but never climb, balance, stoop, kneel, crouch, crawl, reach, handle, finger, or feel. R. 518. He stated that Plaintiff must avoid moderate exposure to dust and fumes and any exposure to extreme cold, extreme heat, weather, wetness, humidity, vibration, hazards, and heights. R. 518. Dr. McDonald opined that Plaintiff needed to lie down or recline for 30 to 45 minutes every 3 to 4 hours. R. 518.

The administrative hearing was held on January 21, 2011. Plaintiff testified that she could not work because she experienced panic attacks, seizures, and shoulder pain, and she was scared to go anywhere by herself. R. 37. Plaintiff also reported

5

difficulty focusing, memory problems, crying spells, and hearing voices. R. 37-38, 53-54.

The administrative law judge ("ALJ") rendered his decision on April 25, 2011. R. 20. At step one of the five-step sequential process, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since February 12, 2009, the application date. R. 13. At step two, the ALJ determined Plaintiff had the following severe impairments: dysthymic disorder, depression, anxiety, shoulder impingement syndrome, and hand pain. R. 13. At step three, the ALJ found Plaintiff did not have a listed impairment. R. 13. For steps four and five, the ALJ concluded that Plaintiff has the residual functional capacity to

> perform light work as defined in 20 CFR 416.967(b). She can lift ten pounds frequently, but is unable to work above chest level, which would also preclude overhead reaching. She can stand and/or walk six hours total in an eight-hour workday. She has no sitting limitations. She is unable to operate heavy equipment or machinery and may not climb, crawl or balance. She is limited to no more than occasional interaction with the public, coworkers and supervisors.

R. 14. Next, the ALJ found, based the vocational expert's testimony, that considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff could perform such as a production assembler and small products assembler. R. 19. Finally, the ALJ concluded Plaintiff had not been under a disability. R. 19.

## II. STANDARD

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision "simply because some evidence may support the opposite conclusion." *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Substantial evidence is "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Gragg v. Astrue*, 615 F.3d 932, 938 (8th Cir. 2010).

6

III. DISCUSSION

A. The ALJ Properly Weighed Dr. McDonald's Opinion

The Court finds that the ALJ properly assigned little weight to Dr. McDonald's opinion.

The ALJ has the responsibility to assess a claimant's RFC based on all the relevant evidence. *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). A treating physician's opinion will be given controlling weight if it is not inconsistent with the other substantial evidence in the record and is well-supported by medically acceptable clinical and laboratory diagnostic techniques. *Woods v. Astrue*, 780 F.Supp.2d 904, 912 (E.D. Mo. 2011) (citing *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998)). "While a treating physician's opinion is usually entitled to great weight, the Eighth Circuit has cautioned that it 'does not automatically control, since the record must be evaluated as a whole.'" *Id.* (quoting *Bentley v. Shalala*, 52 F.3d 784, 785-86 (8th Cir. 1995)). Accordingly, a treating physician's opinion can be discounted where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions. *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000). The ALJ must give "good reasons" for the particular weight given to a treating physician's evaluation. 20 C.F.R. § 404.1527(d)(2).

Plaintiff argues the ALJ incorrectly stated that Dr. McDonald "may have seen [her] on about two occasions." R. 18. Plaintiff contends that Dr. McDonald examined Plaintiff "on numerous occasions" and that because "[t]he ALJ's characterization of [Plaintiff's] treatment relationship was flawed, [it] showed that he did not properly consider Dr. McDonald's opinion." The Court disagrees. Defendant points out that the Record shows that Dr. McDonald likely examined Plaintiff five times and that treatment notes from those visits appear to contain handwriting from two different people. R. 429, 433, 436, 438, 450. The ALJ did note that Dr. McDonald "may have seen [Plaintiff] on about two occasions," but he also stated that Dr. McDonald "supervised nurse practitioners treating [Plaintiff]." R. 18. The ALJ acknowledged that Dr. McDonald directed Plaintiff's treatment. The ALJ was not required to recontact Dr. McDonald for

clarification as Plaintiff suggests. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) (noting that an ALJ does not "have to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped."). Further, the weight assigned to Dr. McDonald's opinion was not based on the number of times Dr. McDonald examined Plaintiff. Instead, the ALJ concluded that Dr. McDonald's opinion deserved little weight because it was inconsistent with the record evidence, including Dr. McDonald's own treatment notes. R. 18. The ALJ also noted that Plaintiff had not complained of such extreme limitations prior to her examination by Dr. McDonald. R. 18.

In addition to the inconsistencies with his own treatment records, Dr. McDonald's opinion that Plaintiff suffered from extreme limitations—such as the ability to stand and/or walk a total of less than an hour and sit only 1 hour in an 8-hour day—was not consistent with other evidence in the Record. A February 2010 x-ray of Plaintiff's shoulders and cervical spine were unremarkable. R. 589, 593. In November 2010, Dr. Reinsel noted that Plaintiff had "normal range of motion in her neck," a normal gait, and an ability to "walk on her heels and toes without difficulty." R. 571. He noted that an MRI of Plaintiff's cervical spine showed "some minor multilevel disc changes, but nothing really substantial." R. 571-72. Many of Plaintiff's doctors' appointments were for shoulder pain. However, a shoulder problem would not appear to limit other abilities, such as sitting or standing. The Court concludes the ALJ properly assigned little weight to Dr. McDonald's opinion.

### B. The ALJ Properly Assessed Plaintiff's RFC

Plaintiff also argues that the ALJ erred in formulating her mental RFC by failing to consider all of her relevant impairments and limitations and failing to fully develop the record. The Court disagrees.

First, Plaintiff contends the ALJ failed to consider her limitations in concentration and focus. By omitting any limitation with respect to concentration and focus, the ALJ obviously concluded that Plaintiff was not limited in this respect. The question then becomes whether there is substantial evidence in the record to conclude that Plaintiff

did not have any limitations relating to concentration and focus. Plaintiff points to evidence that she exhibited mood swings, fearful and anxious behavior, and auditory hallucinations. Plaintiff's Brief, at 15. Plaintiff also notes that she was hospitalized after an intentional overdose, that she was easily overwhelmed, and had some paranoid thinking. Plaintiff's Brief, at 15. Unfortunately for Plaintiff, this evidence does not suggest that she is limited in the areas of concentration and focus. After a thorough review of the Record, the Court found the following evidence relating to concentration and focus: on January 6, 2009, Ms. Cooper observed that Plaintiff had intact memory and perception within normal limits. R. 445-46. On January 19, 2010, Ms. Cooper noted that Plaintiff's thought patterns were within normal limits. R. 439. On May 21, 2010, Dr. Stevens observed that Plaintiff had deficits in immediate memory, but had intact quality of thinking and abstract conceptual reasoning. R. 420. On November 3, 2010, Dr. Satnam noted that Plaintiff had difficulty concentrating and focusing on task. R. 565. However, he also indicated that Plaintiff had a normal flow of thought. R. 565. The only other references to concentration and focus were Plaintiff's self-reporting at an appointment and testimony at the administrative hearing that she had difficulty concentrating and difficulty focusing and remembering things. R. 38, 557. The ALJ found that Plaintiff's own reports about her mental symptoms were not fully credible, and this finding was relevant to the RFC. Although there are two single occasions in which Dr. Stevens and Dr. Satnam opined that Plaintiff had deficits in memory, concentration, and focusing, considering the Record as a whole, there is substantial evidence to support a finding that Plaintiff was not limited in the areas of concentration and focus.

Next, Plaintiff argues the ALJ failed to properly consider Plaintiff's inability to handle normal everyday stressors. Plaintiff points to evidence showing: she was unable to shop alone because she was too afraid of the store; she became physically and emotionally exhausted if she had to interact with people; she became tearful when discussing her stress; and she was emotional during appointments. Plaintiff's Brief, at 16. However, the RFC accounted for this by limiting Plaintiff to no more than occasional interaction with the public, coworkers, and supervisors. This limitation

accounts for Plaintiff's inability to handle everyday stressors and the Court finds no error.

Finally, Plaintiff argues the ALJ erred in not sending Plaintiff for a further consultative examination due to an alleged lack of medical opinion evidence related to Plaintiff's mental limitations. The Court disagrees. "While an ALJ has a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011). "The ALJ is required to order additional examinations only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Id.* Here there is substantial evidence documenting Plaintiff's mental health, and the ALJ's decision that Plaintiff was only limited to no more than occasional interaction with the public, coworkers, and supervisors—and no other mental limitations—was supported by substantial evidence.

The Court concludes that there is substantial evidence in the Record to support the ALJ's RFC determination.

## IV. CONCLUSION

There is substantial evidence in the Record to support the ALJ's decision. The Commissioner's final decision is affirmed.

IT IS SO ORDERED.

                                                       /s/ Ortrie D. Smith
                                                       ORTRIE D. SMITH, SENIOR JUDGE
DATE: October 28, 2013                        UNITED STATES DISTRICT COURT